*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
THE COURT EN BANC

_____

**UNITED STATES**
Appellee

**v.**

**Stephen A. BEGANI**
Chief Petty Officer (E-7)
U.S. Navy (Retired)
Appellant

**No. 201800082**

Argued (Panel): 29 March 2019[1]
Reargued (En Banc): 20 November 2019
Decided: 24 January 2020.

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Captain Stephen C. Reyes, JAGC, USN. Sentence adjudged 1 December 2017 by a general court-martial convened at Fleet Activities Yokosuka, Japan, consisting of a military judge sitting alone. Sentence approved by the convening authority: confinement for 18 months and a bad-conduct discharge.

For Appellant: Lieutenant Daniel E. Rosinski, JAGC, USN (argued and on brief).

For Appellee: Lieutenant Timothy C. Ceder, JAGC, USN (argued); Captain Brian L. Farrell, USMC (on brief); Lieutenant Kimberly Rios, JAGC, USN (on brief).

---

[1] We heard the panel oral argument in this case at Pennsylvania State University Law School, State College, Pennsylvania.

Judge STEPHENS announced the judgment of the Court and delivered an opinion in which Senior Judge TANG joined. Judge GASTON filed a separate opinion, concurring in part and concurring in the result, in which Senior Judge KING joined. Chief Judge CRISFIELD filed a separate dissenting opinion, in which Senior Judge HITESMAN and Judge LAWRENCE joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

STEPHENS, Judge:

Appellant was convicted, pursuant to his pleas, of one specification of attempted sexual assault of a child and two specifications of attempted sexual abuse of a child, in violation of Article 80, Uniform Code of Military Justice (UCMJ).[2] The convening authority approved the adjudged period of confinement and, pursuant to a pretrial agreement, commuted the adjudged dishonorable discharge to a bad-conduct discharge.

At the time he committed the offenses in Japan, Appellant was no longer serving in the Regular component of the United States Navy, but had transferred to inactive status in the Fleet Reserve. He asserts five assignments of error (AOEs), which we renumber as follows: (1) as a member of the Fleet Reserve, he is no longer a member of the Armed Forces and therefore cannot constitutionally be subjected to trial by court-martial under the UCMJ; (2) that Appellant's Fifth Amendment Due Process right to equal protection of the laws was violated because Article 2, UCMJ, subjects members of the Fleet Reserve and retirees from Regular components to court-martial jurisdiction, but not retirees of Reserve components; (3) he did not receive adequate notice under Article 137, UCMJ, or other authority, that he was subject to trial by court-martial for misconduct committed in a foreign country; (4) as a member of the Fleet Reserve, he cannot be punitively discharged from the service; and (5) as a member of the Fleet Reserve, he cannot be subjected to court-martial jurisdiction without first being recalled to active duty.[3]

---

[2] 10 U.S.C. § 880 (2012).

[3] The final AOE is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

In an opinion published on 31 July 2019, a panel of this Court found merit in Appellant's second AOE, concluded that the court-martial lacked jurisdiction over Appellant due to an equal protection violation, and dismissed the approved findings and sentence. We subsequently granted the Government's request for en banc consideration and withdrew the earlier panel decision. We now find no prejudicial error and affirm.

## I. BACKGROUND

After 24 years of active duty service, and numerous voluntary reenlistments, Appellant elected to transfer to the Fleet Reserve.[4] He was honorably discharged from active duty and started a new phase of his association with the "land and naval Forces"[5] of our Nation. In short, for all intents and purposes, he retired. In addition to receiving "retainer pay," base access, and other privileges accorded to his status as a member of the Fleet Reserve, he remained subject to the UCMJ under Article 2(a)(6).

After Appellant retired, he remained near his final duty station, Marine Corps Air Station (MCAS) Iwakuni, Japan, and worked as a government contractor. Within a month, he exchanged sexually-charged messages over the internet with someone he believed to be a 15-year-old girl named "Mandy," but who was actually an undercover Naval Criminal Investigative Service (NCIS) special agent. When he arrived at a residence onboard MCAS Iwakuni, instead of meeting with "Mandy" for sexual activities, NCIS special agents apprehended him.

The Commander, U.S. Naval Forces Japan, sought approval from the Secretary of the Navy to prosecute Appellant at a court-martial, as opposed to seeking prosecution in U.S. District Court under the Military Extraterritorial Jurisdiction Act (MEJA).[6] Because Appellant was still subject to the UCMJ, and therefore ineligible for prosecution under MEJA,[7] the Secretary authorized the Commander to prosecute him at court-martial.

---

[4] 10 U.S.C. § 6330(b). In 2018, Congress redesignated § 6330 as 10 U.S.C. § 8330, Pub. L. No. 115-232, §§ 807(b)(15), 809(a), 132 Stat. 1836, 1840 (2018). We will hereinafter refer to relevant portions of Title 10, Part II by their redesignated sections.

[5] U.S. Const., Article I, § 8, cl 14.

[6] 18 U.S.C. § 3261.

[7] *See* 18 U.S.C. § 3261(d).

After Appellant unconditionally waived his right to a preliminary hearing under Article 32, UCMJ, he entered into a pretrial agreement (PTA). In his PTA, he waived his right to trial by members and agreed to plead guilty and be sentenced by a military judge. He also waived all waivable motions except for one. He argued he could not lawfully receive a punitive discharge because he was a member of the Fleet Reserve. The trial court denied that motion.

## II. DISCUSSION

Congress has the sole authority under the Constitution to make regulations for the land and naval Forces. Implicit in this authority is the power to determine who is subject to court-martial jurisdiction, whether by virtue of membership in the land and naval Forces or some other circumstance that enhances the orderly operation of the military. Court-martial jurisdiction, based on the text of the Fifth Amendment, necessarily deprives an individual of the fundamental right to a grand jury. Court-martial jurisdiction also deprives an individual of the fundamental Sixth Amendment right to a civilian jury trial. Congress created three different groups of military retirees, but currently subjects only two of them to continuous court-martial jurisdiction. Congress considers these groups different for purposes of the overall operation of the land and naval Forces and we owe great deference to its statutory scheme in this area in recognizing Appellant is subject to the UCMJ as a member of the Fleet Reserve.

In considering Appellant's equal protection argument, we find that members of the Fleet Reserve are not similarly situated with retirees from the Reserve Components. Even if they were, Congress has the constitutional authority to subject one, but not the other, to court-martial jurisdiction.

### A. Court-Martial Jurisdiction over Members of the Fleet Reserve

*1. Congressional authority over the land and naval Forces*

It is unquestioned that Congress has the authority to "make Rules for the Government and Regulation of the land and naval Forces."[8] According to Justice Story, this power is "a natural incident"[9] to Congress' constitutional

---

[8] U.S. CONST. art. I, § 8, cl. 14.

[9] JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, 418 (Ronald D. Rotunda, John E. Novak, Carolina Academic Press 1987) (1833).

authority to "declare war,"[10] to "raise and support Armies,"[11] to "provide and maintain a Navy,"[12] and to provide for "calling forth"[13] and "organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States."[14] The land and naval Forces clause was unremarkable and taken almost directly from the Articles of Confederation.[15]

It is also unquestioned that Soldiers, Sailors, and other Service Members do not possess the same constitutional rights at court-martial that they would in civilian court. This reflects an understanding of the necessity for military discipline—which Washington once called "the soul of an Army"[16]—to be elevated over certain fundamental constitutional rights. And this is explicitly recognized in the Fifth Amendment grand jury right for those answering for "a capital, or otherwise infamous crime . . . *except in cases arising in the land or naval forces* . . . [.]"[17] The very nature of military service means an abrogation of certain rights accorded to other persons.

Commensurate with this service concept, the preamble to the Manual for Courts-Martial (MCM) has long stated that "[t]he purpose of military law is to promote justice, to assist in maintaining good order and discipline, to promote efficiency and effectiveness in the military establishment, and thereby to strengthen the national security of the United States."[18] Over time, the modern court-martial system statutorily enacted in 1950 has expanded. For a time, it was focused on expeditiously adjudicating only service-

---

[10] U.S. CONST. art. I, § 8, cl. 11.

[11] U.S. CONST. art. I, § 8, cl. 12.

[12] U.S. CONST. art. I, § 8, cl. 13.

[13] U.S. CONST. art. I, § 8, cl. 15.

[14] U.S. CONST. art. I, § 8, cl. 16.

[15] ARTICLES OF CONFEDERATION OF 1781, art. IX, para. 4. "The united states, in congress assembled, shall also have the sole and exclusive right and power of…making rules for the government and regulation of the said land and naval forces, and directing their operations."

[16] George Washington, Letter of Instructions to the Captains of the Virginia Regiments (July 29, 1759), *in*, ROBERT A. NOWLAN, THE AMERICAN PRESIDENTS, WASHINGTON TO TYLER, 69 (2012).

[17] U.S. CONST. amend. V.

[18] MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2019 ed.), Part I, ¶ 3. The Preamble first appears in the MCM in the 1984 edition.

related crimes, leaving to civilian courts the task of adjudicating non-service-related crimes.[19] At present, both service-related crimes and non-service-related crimes may be prosecuted at courts-martial.[20] Today, the military justice system features many of the same protections found in civilian justice systems.[21]

The question before us now is, which members of the "land and naval Forces" can be subject to the UCMJ?

### 2. The statutory scheme of Article 2, UCMJ

At first blush, Article 2 has an odd assortment of characters who are subject to the UCMJ. Generally speaking, Article 2 includes anyone actively serving in uniform, Service Academy students, new enlistees, paid volunteers performing military duties, military prisoners, enemy prisoners of war, and certain persons assigned to serve with the military, or accompanying the military in combat or outside the United States or its territories. The list includes some, but not all, military retirees. It also includes retired Reservists who are receiving hospitalization from an armed force. The common thread in Article 2 is to include those classes of persons Congress has determined it needs to maintain control over for the orderly conduct of the land and naval Forces.

Article 2 has an on-again-off-again approach to Reservists.[22] While they are traveling to and from inactive-duty training, during those training peri-

---

[19] *See O'Callahan v. Parker*, 395 U.S. 258 (1969) (courts-martial lack jurisdiction to try service members for non-military offenses lacking a service connection).

[20] *Solorio v. United States*, 483 U.S. 435 (1987) (abandoning the "service-related" test from *O'Callahan*, Court held appellant's active duty status sufficient for court-martial jurisdiction in alleged crimes against civilians).

[21] *Ortiz v. United States*, 138 S. Ct. 2165, 2170 (2018) (describing military justice system of trial and appellate courts as "integrated 'court-martial' system that closely resembles civilian structures of justice").

[22] Prior to implementation of the UCMJ, retirees of the Reserve Component of the Navy were on the same retired list as the retirees of the Regular Component. The Navy ceded jurisdiction over its Reserve Component retirees to mirror the Army's practice of not subjecting its Reserve Component retirees to jurisdiction. *See Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. of the H. Comm. On Armed* Services, 81st Cong. (1949) [hereinafter *UCMJ Hearing*], *reprinted in* William K. Suter, *Index and legislative History: Uniform Code of Military Justice* 868-69, 1261-62 (William S Hein & Co. 2000); *see also* H.R. Rep. No. 81-491, at 10 (1949); S. Rep. No. 81-486, at 7 (1949) *reprinted in* SUTER, *supra*.1261 (William S

ods, and in any intervals for consecutive days of training periods, they are subject to the UCMJ. When the travel from the inactive-duty training ends, so does the Article 2 jurisdiction. For typical Reservist careers, this is a regular feature of their lives starting with entry into service and terminating with discharge from Reserve service or retirement from the Reserve component. Reservists who retire typically will not receive any retirement pay until age 60.[23] Absent being hospitalized in a military facility, in neither the "gray zone" between Reservists' retirement and age 60, nor when they actually begin receiving retirement pay, will they ever be subject to the UCMJ.[24]

This was not always the case with Reservists. Before 1950, the Navy, but not the Army, maintained jurisdiction over its Reserve retirees. When Congress enacted the UCMJ, it understood this difference and expressly understood the Navy recommended relinquishing jurisdiction over its Reserve retirees. It also expressly understood it was maintaining jurisdiction over its Regular retirees but not its Reserve retirees (except those receiving treatment in military hospitals). Since then, Congress has amended and reauthorized Article 2 well over a dozen times.[25] It even amended Article 2 in 2016 so that Reservists would be subject to the Code traveling to and from inactive-duty training.[26] Throughout these myriad changes, Congress has left untouched the jurisdictional difference between Reservist retirees and active duty retirees.

Article 2 recognizes different types of active duty retirees. It is "common knowledge in the military community"[27] that active duty service members may elect to "retire" after 20 years of service. The Navy and Marine Corps have a separate group of enlisted Sailors and Marines who have more than 20, but less than 30, years of service. With the clarity that is the hallmark of defense bureaucracy, these groups of "retirees" are placed into what is known as the Fleet Reserve, to which Appellant belongs, and the Fleet Marine Corps

---

Hein & Co. 2000) (1950) at 868, 1261. *See also* H.R. Rep. No. 81-491, at 10 (1949); S. Rep. No. 81-486, at 7 (1949) *reprinted in* Suter.

[23] 10 U.S.C. § 12731(e).

[24] Article 2(a)(5), UCMJ.

[25] Congress amended Article 2 in 1959, 1960, 1962, 1966, 1979, 1980, 1982, 1983, 1986, 1988, 1996, 2006, 2009, 2013, and in 2016. *See* 10 U.S.C. § 802 (2016).

[26] Compare 10 U.S.C. § 802(a)(3) (2013) with 10 U.S.C. § 802(a)(3) (2016).

[27] *United States v. Stargell*, 49 M.J. 92, 94 (C.A.A.F. 1998).

Reserve, though neither has anything to do with the Reserve components.[28] Members of these groups transfer to the Navy and Marine Corps retired list after reaching 30 years of combined active duty service and Fleet Reserve or Fleet Marine Corps Reserve membership. The Army and Air Force have no such comparable "Reserve" pool of active duty enlisted retirees between 20 and 30 years of service. All active duty Navy and Marine officers are placed directly onto their Services' retired lists when they retire, along with their retired enlisted counterparts with 30 years of service. All active duty retirees who are "entitled to pay" are subject to the UCMJ.[29]

### 3. Recalling active duty and Reserve retirees to service

Congress established essentially three different groups of retirees of the land and naval Forces. The Regular component retirees; the members of the Fleet Reserve and Fleet Marine Corps Reserve; and the retirees of the Reserve components. Commensurate with these groups' different treatment under Article 2, Congress developed different mechanisms, which have different attendant effects, for both paying and recalling each of them in a time of war or national emergency.

#### a. The Fleet Reserve

The Fleet Reserve (and its Marine Corps equivalent, the Fleet Marine Corps Reserve) was established under the Naval Reserve Act of 1938, to serve as a repository to which enlisted members could voluntarily be transferred upon retirement from active duty until they completed 30 years of service.[30] The Fleet Reserve was specifically designed to serve as a trained body of experienced naval Service Members who could be recalled to active duty when needed.[31] Consistent with this underlying purpose, members of the Fleet Reserve are subject to recall to active duty by the Secretary of the Navy "at any time."[32] To that end, they are required to "[m]aintain readiness for active service in event of war or national emergency" and to keep Navy authorities apprised of their location and "any change in health that might

---

[28] Article 2(a)(6), UCMJ.

[29] Article 2(a)(4), UCMJ

[30] Pub. L. No. 75-732, 52 Stat. 1175 (1938).

[31] *Murphy v. United States*, 165 Ct. Cl. 156, 160 (Ct. Cl. Mar. 13, 1964) (citing *United States v. Fenmo*, 167 F.2d 593, 595 (2d Cir. 1948)), *cert. denied*, 379 U.S. 922 (1964); *Abad v. United States*, 144 F. Supp. 951 (Ct. Cl. 1956).

[32] 10 U.S.C. § 688.

prevent service in time of war"; remain "subject at all times to laws, regulations, and orders governing [the] Armed Forces"; and even in peacetime can be required to perform up to two months of active service every four years.[33] In exchange for remaining ready for any rapid recall, they receive a regular salary called "retainer pay,"[34] which at least one State court has viewed as payment for current, not past, services rendered.[35]

### b. Retired members of the Regular (active duty) components

Once members of the Fleet Reserve have reached 30 years of service, they may transfer to the Navy's retired list and join the ranks of retired members of Regular (active duty) components.[36] Like members of the Fleet Reserve, these retirees remain subject to being recalled "at any time" to active duty by the Secretary of the relevant military department.[37] In exchange, they receive a regular salary in the form of retirement pay.[38] While the Supreme Court has viewed, for tax purposes, this salary as deferred pay for past services,[39] the salary such retirees receive has generally been viewed not as a mere pension but as "a means devised by Congress to assure their availability and preparedness for future contingencies."[40]

---

[33] Naval Military Personnel Manual, Art. 1830-040 (Ch-38, 19 December 2011); 10 U.S.C. § 8333.

[34] 10 U.S.C. § 8330(c).

[35] *See Sprott v. Sprott*, 576 S.W.2d 653 (Tx. Civ. App. Beaumont 1978).

[36] 10 U.S.C. § 8326(a).

[37] 10 U.S.C. § 688.

[38] 10 U.S.C. § 8333.

[39] *Barker v. Kansas*, 503 U.S. 594, 605 (1992).

[40] *United States v. Hooper*, 9 U.S.C.M.A. 637, 645 (C.M.A. 1958); *see also United States v. Tyler*, 105 U.S. 244, 244-46 (1882); *Hooper v. United States*, 326 F.2d 982, 987 (Ct. Cl. 1964) (finding "the salary [the active duty retiree] received was not solely recompense for past services"); *McCarty v. McCarty*, 453 U.S. 210, 221-22 (1981) (finding "military retired pay differs in some significant respects from a typical pension or retirement plan").

c. Retired members of Reserve components

Members of Reserve components may retire once they meet the time in service and other eligibility requirements.[41] Even when eligible to retire, however, reservists typically are not entitled to retirement pay until they reach age 60.[42] In the interim, they may request to be transferred to inactive status, during which time they are not required to participate in any training or other program connecting them to their Reserve components.[43] Once in such an inactive or retired status, reservists may not be ordered to active duty unless, "[i]n time of war or of national emergency declared by Congress, or when otherwise authorized by law," the Secretary of the military department, with the approval of the Secretary of Defense, "determines that there are not enough qualified Reserves in an active status . . . who are readily available."[44] Otherwise, between the time they retire and the time they become eligible to start receiving retirement pay, they receive no pay and have very little ongoing connection with the Armed Forces.

### 4. Judicial deference to Congress

This collection of statutes and Department of Defense instructions portrays Congress' (and the Executive Branch's) clear view that the three groups of retirees are separate and distinct when considered in the context of national military policy—a determination which the Constitution plainly authorizes Congress to make (and the Executive Branch to implement). It is well-settled that "judicial deference" to Congress is "at its apogee" when Congress legislates under its authority to raise and support armies.[45] Judicial deference is not blind, nor is it unlimited, and cannot be used to vouchsafe actions that exceed the Constitution's limitations imposed on Congress. In the area of military affairs, Congress remains subject to the limitations of the Due Process Clause.

For most of our Nation's history, the Supreme Court took a "hands-off" approach to courts-martial. One early case, *Martin v. Mott*,[46] arose from

---

[41] 10 U.S.C. § 12731.

[42] 10 U.S.C. § 12731(e).

[43] 10 U.S.C. § 12735.

[44] 10 U.S.C. § 12301(a).

[45] *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981).

[46] 25 U.S. 19 (1827).

Jacob Mott's refusal to muster when President James Madison called forth the militia during the War of 1812. Mott disagreed with the President that there was a danger of imminent invasion. He was court-martialed for his refusal. Justice Story, writing for the Court, declined to conduct *any* substantive review of the President's decision. The Court did not just merely invoke "prompt and unhesitating obedience to orders"[47] between a militiaman and his commander, but considered the consequences of individual, and judicial, second-guessing of the President and Congress when enacting military policy.

Soon after Congress enacted the UCMJ in 1950, the Supreme Court in *United States ex rel. Toth v. Quarles*[48] held that an honorably discharged Airman could not be court-martialed, despite Article 2's assertion of jurisdiction over him, for a murder he committed in Korea about 10 weeks before his discharge. The UCMJ allowed for prosecution at court-martial of anyone who had been discharged, but was subject to the Code when they committed an offense punishable by confinement of five years or more, and who could not be tried in any State or Federal court for that offense. The Court reasoned that the fully discharged (not retired) Toth was no longer "in" the land and naval Forces for purposes of subjecting him to court-martial jurisdiction pursuant to Congress' constitutional powers.

Two years after *Toth*, the Court reached a similar conclusion in *Reid v. Covert*.[49] The Court held that Article 2(a)(11)'s grant of jurisdiction over persons "accompanying the armed forces without the continental limits of the United States" and its territories could not constitutionally be applied to the wife of an Air Force sergeant charged with murdering her husband while stationed in England. As in *Toth*, the Court found the jurisdictional provision constitutionally infirm because "civilian wives, children, and other dependents" are not members of the "land and naval Forces" subject to Congress' power to regulate. Appellant now asks us to compare him to the discharged Airman in *Toth* and consider him "wholly separated from the service."[50] We cannot.

As discussed above, Appellant is a member of the Fleet Reserve. This makes him, in Congress' view, a member of the land and naval Forces. He is

---

[47] *Id.* at 30.

[48] 350 U.S. 11 (1955).

[49] 354 U.S. 1 (1957).

[50] *Id.* at 85.

subject to recall "almost at the scratch of"[51] the Secretary of the Navy's pen. And, however likely or unlikely our current national defense posture makes it, he may still be required to perform duties. There may be valid arguments as to whether or not Mr. Toth or Mrs. Covert could be subjected to the Code due to the potential for their actions to impact good order and discipline.[52] But the salient point in those cases is that they were simply not in any discernable way "in" the armed forces and could not fall under Congressional authority to regulate their behavior as such. We look just as much to Congress' explicit constitutional grant of authority for regulating the land and naval Forces when evaluating who is subject to the Code as to whether the person's actions could impact good order and discipline. It should not be lost in our analysis that there are other classes of people who are not "in" the armed forces, but who nevertheless fall under the ambit of Article 2 jurisdiction because Congress desires to regulate their behavior for the efficiency of the operation of the land and naval Forces.[53]

We decline Appellant's invitation to overrule our recent decision in *United States v. Dinger*, where we held that members of the Fleet Marine Corps Reserve are subject to the Code.[54] We also note the binding precedent of our superior court's similar holding in *United States v. Overton*, which reinforced decades of case precedent on this very issue.[55] We are satisfied that as a member of the Fleet Reserve, Appellant is a member of the land and naval Forces and that Congress has the authority to make him subject to the UCMJ under its constitutional power to regulate those Forces.

## B. Equal Protection

We now turn to whether Congress violated Appellant's right to equal protection when it made him, along with other members of the Fleet Reserve,

---

[51] *United States v. Wheeler*, 10 U.S.C.M.A. 646, 655 (C.M.A. 1959).

[52] Both cases had vigorous dissents. *Toth* was decided 6-3 with a lengthy dissent by Justice Reed and a brief one by Justice Minton. *Covert* was decided 6-2 with a dissent by Justice Clark, who joined the Court's opinion in *Toth*.

[53] Prisoners of war are subject to the Code under Article 2(a)(9) and (13). Under Article 2(a)(7), military prisoners, even after they receive their DD-214s (Certificate of Discharge from active duty), are subject to the Code if they are still in a military brig serving a sentence imposed by a court-martial.

[54] 76 M.J. 552 (N-M. Ct. Crim. App. 2017), *aff'd*, 77 M.J. 447 (C.A.A.F. 2018), *cert. denied,* __ U.S. __, 139 S. Ct. 492 (2018).

[55] 24 M.J. 309 (C.M.A. 1987).

subject to the Code, but declined to do the same for retirees from the Reserve components. While the Fourteenth Amendment on its face prohibits only the States from "deny[ing] any person within its jurisdiction the equal protection of the laws,"[56] the Supreme Court has held its equal protection component applies to the Federal government via the Fifth Amendment Due Process Clause.[57] The Fifth Amendment, in pertinent part, states:

> No person shall be held to answer for a capital, or otherwise infamous, crime, unless on a presentment or indictment of a Grand Jury, *except in cases arising in the land or naval forces, or in the Militia, when in actual service, in time of War, or public danger* . . . nor be deprived of life, liberty, or property, without due process of law . . . [.][58]

The text of the Fifth Amendment—the source for Appellant's alleged equal protection violation—reveals several features. First, the amendment treats "cases arising in the land and naval forces" as categorically separate and distinct from those tried in civilian courts concerning the fundamental right to a grand jury. Second, with respect to that right, it differentiates between the standing "land and naval forces" and the temporary "Militia." Finally, it declares that the right to a grand jury is excepted from the Militia only during times of actual service, time of war, or public danger.[59]

Taken together, this language reveals a design whereby the Constitution explicitly allows Congress, as the creator of all Federal tribunals and courts-martial, to withhold certain otherwise fundamental constitutional rights from those in the profession of arms, and for the circumstances of their service to be considered when so doing. As the Supreme Court long ago explained,

> [I]n pursuance of the power conferred by the Constitution, Congress has declared the kinds of trial, and the manner in which they shall be conducted, for offenses committed while the party is in the military or naval service. Every one connected with these branches of the public service is amenable to the jurisdiction which Congress has created for their government,

---

[56] U.S. CONST., Amend XIV, sec. 1.

[57] *Bolling v. Sharp*, 347 U.S. 497 (1954).

[58] U.S. CONST., Amend V (emphasis added).

[59] *Johnson v. Sayre*, 158 U.S. 109, 115 (1895) (holding the three modifying phrases apply only to the word, "Militia").

and, while thus serving, surrenders his right to be tried by the
civil courts.[60]

While there is no question the right to a grand jury and the right to a trial
by jury are fundamental constitutional rights, they are only fundamental to
the extent (and to the persons to whom) the Constitution grants them in the
first place.

This intentional design, found on the face of the Constitution, is of vital
importance in this case for two reasons. First, it impacts how we view wheth-
er Appellant is indeed "similarly situated" with a retired Reservist. The law
of equal protection leaves to the legislature the initial discretion to determine
what is "different" and what is "the same," and also broad latitude to estab-
lish classifications depending on the nature of the issue, the competing public
and private concerns it involves, and the practical limitations of addressing
it.[61] Generally, these discretionary legislative decisions are valid and enforce-
able as long as the classification is drawn in a manner rationally related to a
legitimate governmental objective.[62] As we shall see, the broad deference
owed to Congress in the area of military affairs makes this an area we do not
lightly second-guess.

Second, this constitutional design evidenced by the Fifth Amendment im-
pacts how we view the fundamental nature of the rights involved, which is
important because the equal protection component's general rule of deference
only gives way when laws involve suspect classifications (which is not at
issue here) or impinge on fundamental personal rights protected by the Con-
stitution.[63] Laws burdening fundamental rights are subjected to strict scruti-
ny and will be sustained only if they are "*necessary* to promote a *compelling*

---

[60] *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 123 (1866).

[61] *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (under Fourteenth Amendment's Equal
Protection clause, children living in Texas, but not legally admitted to the United
States, could not be denied enrollment in public schools solely on the basis of their
citizenship).

[62] *Schweiker v. Wilson*, 450 U.S. 221, 230 (1981) (statute governing subsistence
funds to qualifying individuals in certain hospitals, nursing homes, and other care
facilities does not unfairly discriminate based on mental health but on whether
institution receives Medicaid funds).

[63] *See, e.g.*, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942).

governmental interest."[64] As the Supreme Court has found, however, the only fundamental right Appellant now claims he is being deprived of—the Sixth Amendment right of trial by jury—has the same constitutional breadth as the grand jury right.[65] Hence, it only applies under circumstances in which the grand jury right would apply.

### 1. Similarly situated

We first take up whether members of the Fleet Reserve are similarly situated with retired members of Reserve components. In doing so, we take all relevant factors into consideration asking the basic question as to whether the subject classes are "materially identical."[66] While not a perfect scientific test, whether two groups are similarly situated has been described by various Federal Courts of Appeal as "identical or directly comparable in all material respects" or "prima facie identical" or even a more "colloquial" phrasing of "apples to apples."[67] We conclude that under any of these tests the two groups are not similarly situated.

While both are generally subject to recall, members of the Fleet Reserve are more so and with less process involved. It appears plain that Congress intended for Fleet Reservists to be among the first "retired" Service Members to be drawn from. No declaration of war or national emergency is required by Congress. No other legal precursors are required. The Secretary of the Navy can return Appellant, and any other members of the Fleet Reserve, to active duty with a mere signature.

The stated purpose of the Fleet Reserve is to "provide an available source of experienced former members of the Regular Navy or Navy Reserve."[68]

---

[64] *Dunn v. Blumstein*, 405 U.S. 330, 342 (1972) (emphasis in original) (citations and internal quotation marks omitted) (Tennessee durational residence laws for voting infringed on fundamental right) (citations omitted).

[65] *Ex parte Milligan*, 71 U.S. at 123. ("[T]he framers of the Constitution, doubtless, meant to limit the right of trial by jury, in the sixth amendment, to those persons who were subject to indictment or presentment in the fifth.").

[66] *Kolbe v. Hogan*, 813 F.3d 160, 185 (4th Cir. 2016).

[67] The Fourth Circuit in *Kolbe* cites, respectively, *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1264 (11th Cir. 2010); and *Barrington Cove Ltd. P'ship v. R.I. House. & Mortg. Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001).

[68] DoD Fin Mgmt. Reg. Vol 7B, Ch 2, § 10201. The "or Navy Reserve" language indicates that someone affiliated with the Navy Reserve may somehow have enough

These members "could be organized without further training to fill billets requiring experienced personnel in the first stages of mobilization during an emergency or in time of war."[69] While this indicates that Navy Reservists could become members of the Fleet Reserve, it does not include *retired* Reservists as members in the Fleet Reserve.

Finally, we would be remiss if we did not consider the typical career path of each group in historical context. In this regard, we decline to follow Appellant's line of argument that *Toth* prohibits context—past or future—from being taken into consideration when assessing whether groups are similarly situated. While the Court in *Toth* declined to look at Toth's *past* connections to the service, we think that is the wrong question to ask here. It made sense to do so in *Toth* because the argument that he very recently used to be in the Air Force was central for the government. The natural response from Toth, and adopted by the Court, was that his current, and not past, association was what mattered. And that would be true for someone who no longer had any association with the armed forces. Because Appellant still has a current, though decreased, association with the armed forces, the question of his past association is relevant in a way which Toth's was not. Appellant's current continuing association is a direct result of his voluntary past associations. They are interwoven in a way that Toth's, with his clean break from the Air Force, were not. We are not compelled to blindly follow the reasoning in *Toth* on this particular issue.

Members of the Fleet Reserve, like Appellant, have typically been career active duty enlisted Sailors. That means they have been on continuous, salaried active military service for at least two decades, and subject to the UCMJ throughout that entire time. Their transfer to the Fleet Reserve is but an extension of this continuity, in terms of salary, readiness requirements, recallability, and jurisdiction.

Retired Reservists, by contrast, typically served on active duty only sporadically. Accordingly, they were only sporadically subjected to UCMJ jurisdiction. Their transfer into retirement further highlights this lack of continuity. Most end up in the so-called "gray zone" for several years until they reach age 60. During this time, they are not required to maintain any readiness, they are far less subject to any form of imminent recall, and they receive no

---

qualifying service time to transfer to the Fleet Reserve. This does not mean that retired Navy and Marine Corps Reservists under 10 U.S.C. § 12731 are members of the Fleet Reserve or Fleet Marine Corps Reserve.

[69] *Id.*

16

pay. Practically the only thing that changes when they reach age 60 is that they start to receive pay, which is essentially an annuity for service they provided years before. And in order to receive that retired pay, the Reservists do not need to maintain any military status whatsoever, including being a member of the Retired Reserve.[70]

### 2. Deference to Congress regarding fundamental right to jury trial

Assuming that Appellant and Reserve component retirees are similar enough to require an equal protection analysis, we recognize the practical effect of jurisdiction on Appellant, or anyone within Article 2 jurisdiction for that matter, is a deprivation of certain fundamental rights. As we stated above, that is often the very nature of the profession of arms.

It is far from clear that we are compelled to review Article 2 under any heightened scrutiny. Other courts have merely applied a rational basis test in considering Congress' different treatment of Regular and Reserve retirees.

In 1963, the District Court for Washington, D.C. issued an opinion in *Taussig v. McNamara*.[71] Taussig, a retired Regular component Naval officer, sued the Federal government. He alleged various actions and policies were unconstitutionally interfering with his right to conduct certain business with the Federal government. He specifically alleged a violation of his right to follow his chosen profession as violations of his "liberty" and "property" rights

---

[70] *See* Department of Defense Financial Management Regulation 7000.14-R, Vol 7B, Ch 6. para. 0604, "Foreign Citizenship After Retirement." The dissent enlists the "obligations and benefits" of retired Reservists from the Navy's Military Personnel Manual (MILPERSMAN 1820-0303(7)) as evidence that retired Reservists are "very similar" to Regular retirees. The retired Reservists are required to inform the Navy of their physical address, they are cautioned to show discretion in using their name and military rank to not appear to imply official DoD or DON endorsement, they and their families have eligibility for health insurance and health care services, etc. Some of the items in this list resemble the obligations for another group of Service Members—those in the Individual Ready Reserve (IRR). *See* BUPERSINST 1001.39F and Marine Corps Order 1235.1A. The IRR Service Members, "the primary force of trained individuals for replacement and augmentation in emergencies" are unquestionably not subject to the Code, even though Article 31(b), UCMJ, warnings may apply to them depending on the facts and circumstances of the questioning. *See United States v. Gilbreath*, 74 M.J. 11, 23-24; n. 4 (C.A.A.F. 2014). Congress chose not to make this group subject to the Code, either. Obligations and benefits—or taxation of income, *see Barker v. Kansas*, 503 U.S. 594 (1992)—should not drive analysis of whether Article 2 violates the Constitution's guarantee of equal protection.

[71] *Taussig v. McNamara*, 219 F. Supp. 757 (D.D.C. 1963).

within the Fifth Amendment where retirees of the Reserve components were not similarly prohibited. He also made a facial challenge to his being subject to the UCMJ under Article 2, where the Reserve component retirees were not. The District Court held that it was "plainly in the power of Congress to distinguish between the Regular and the Reserve retired officer"[72] when it came to selling to the service in which he held a retired status. The District Court explained:

> It is plainly for Congress to decide which categories of retired members of the Armed Forces should be subject to the Code. There is clearly a rational distinction between the careerist, who is subject to recall at any time during war or national emergency, *see* 10 U.S.C. § 6481 (applying to retired officers of the regular Navy and Marine Corps) and the reservist, who is subject to recall only as a second-line of manpower, *see* 10 U.S.C. § 672(a). In view of the repeated applications [Article 2] to regular retired officers . . . this Court is in no position to say that the determination by Congress that retired reserve officers (unless hospitalized. . .) shall not be subject to the Code is anything but completely proper.[73]

In 1964, Congress passed the Dual Compensation Act that required Regular component retirees to have reduced retired pay if they worked for the Federal government.[74] The Act made no such provision for Reserve component retirees. A group of retired Regular component officers sued the Federal government over the decrease in their retired pay arguing the Act violated the equal protection component of the Fifth Amendment's Due Process clause. The U.S. Court of Claims denied the officers' claim because it found a rational basis for the Act. One of the reasons was the differences between the offices held by the Regular and Reserve component retirees:

> A regular officer who has retired status remains a member of the regular armed services. A retired reserve officer's status is different—he can be ordered to active duty only in time of war or national emergency after all active reservists have been called. A retired regular officer, therefore, continues at all

---

[72] *Id.* at 761-62.

[73] *Id.* at 762.

[74] 5 U.S.C. § 5532 (1966) (repealed 1999).

times to hold an office in the military—he is already a federal officeholder.[75]

Of course, both of these cases were based on "pure" equal protection claims and did not directly infringe on fundamental rights. They also involve officers and not the more similar comparison between the enlisted retirees in the Fleet Reserve, such as Appellant, and the enlisted retirees of the Reserve Component. But it still strikes us as odd that in one scenario, Congress would be free to legislate based on the differences between the two dissimilar groups and courts would be satisfied with some rational reason for Congressional action, but in the present scenario, we would not only find the groups suddenly similar, but would be compelled to apply strict scrutiny.

We also must keep in mind we are delving into "Congress' authority over national defense and military affairs, and perhaps no other area has the [Supreme] Court accorded Congress greater deference."[76] In *Rostker v. Goldberg*, the Court held that a military draft that excluded women on the basis of sex did not violate equal protection. In doing so, the Court focused significantly on Congress' constitutional authority to make such regulations for the armed forces. The Court eschewed a heightened scrutiny analysis, specifically the usual intermediate scrutiny test for sex-based differences. At that time, women were barred from combat roles. Because the draft was to provide combat troops, the registration of only men was "closely related" to Congress' purpose. The Court held that "the sexes are not similarly situated" for the purposes of the draft and the "Constitution requires that Congress treat similarly situated persons similarly, not that it engage in gestures of superficial equality."[77]

We look to the Supreme Court for guidance in whether to formally apply strict scrutiny analysis or to generally defer to Congress in military matters. *Rostker*, and other cases concerning the military, arose in more pure equal protection categories, such as sex discrimination, rather than cases more focused on the fundamental rights aspect of the equal protection component of the Due Process clause. But we believe the same sort of deference is due to Congress in military matters for equal protection challenges based on the deprivation of a fundamental right.

---

[75] *Puglisi v. United States*, 215 Ct. Cl. 86, 97 (Ct. Cl. 1977).

[76] *Rostker v. Goldberg*, 453 U.S. 57, 64-65 (1981).

[77] *Id*. at 79.

In *Frontiero v. Richardson*,[78] the Court invalidated regulations that awarded increased military benefits to married men, but not married women. Because these differences were based on sex, and "*solely* for the purpose of achieving administrative convenience"[79] the regulations were unable to withstand the Court's heightened scrutiny review. But then, just two years later, in *Schlesinger v. Ballard*,[80] the Court declined to apply any heightened scrutiny to Naval regulations that discriminated based on sex. Congress mandated involuntary separation for male Naval officers who failed to promote to Lieutenant Commander after nine years, but allowed female officers an additional four years. The Court eschewed a heightened scrutiny test not only because the disparate treatment of the men and women was not based on "archaic and overbroad generalizations"[81] but also because it was based on some operational need and concern of the Navy. The Court found the regulations to have "complete *rationality*."[82] The Court concluded that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. The responsibility for determining how best our Armed Forces shall attend to that business rests with Congress, and with the President."[83]

As outlined above, Congress clearly sees Appellant and other members of the Fleet Reserve (and Fleet Marine Corps Reserve), retirees from the Regular component, and retirees from the Reserve component, as having meaningful differences in the context of the overall land and naval Forces. This expresses itself most clearly in recall procedures in the event of a major war. While we are currently in a post-Cold War era and have seen high operating tempo with the Global War on Terror, it is Congress' duty to be prepared for the kind of catastrophic military necessity that could threaten our Nation's very existence. This certainly qualifies as a significant and compelling governmental interest. It also appears that Congress, in giving effect to its over-

---

[78] 411 U.S. 677 (1973).

[79] *Id.* at 690 (emphasis in the original).

[80] 419 U.S. 498 (1975).

[81] *Id.* at 508.

[82] *Id.* at 509 (emphasis added). Justice Brennan, the author of *Frontiero*, wrote a lengthy dissent arguing the Court should have applied "close judicial scrutiny." *Id.* at 511 (Brennan J., dissenting).

[83] *Id.* at 510 (citing and quoting *Toth v. Quarles*, 350 U.S. 11, 17 (1955)) (internal quotations omitted).

all national security structure, decided to only subject those to UCMJ juris-
diction, (and only under the necessary circumstances) that it believes are
required for the efficient regulation of the land and naval Forces.

Whether subjecting Appellant and all other retirees, Regular or Reserve
components, to the Code, has the same *de minimus* impact on good order and
discipline is not the sole focus of our analysis. It is also not the sole way, or
even the relevant way, Congress views these groups. If we were to find oth-
erwise and conclude that equal protection compels Congress to subject either
all retirees to the Code or none of them, we would arrive at absurd results.

If all retirees were subject to the UCMJ, this would mean that Reservists
would have spent their whole career only sporadically being subject to the
Code during in-active duty training or some other active service, but in all
other respects of daily life, being civilians. Then, upon retirement, these same
Reservists—even in the "gray zone" before retirement pay commenced at age
60—would suddenly be continually subject to the UCMJ in a way they never
were prior to retirement. It would be one thing if Congress could explain this
to retired Reservists that it had some considered judgment, held hearings, or
studied the issue. It would be quite another to just philosophically invoke
"equal protection" as an explanation.

We reach an equally absurd result in not subjecting any retirees to the
UCMJ. If Congress desired to recall a significant number of retirees to active
duty for a war or other large-scale contingency (without amending Article 2 to
make the Fleet Reserve, Fleet Marine Corps Reserve, and Regular Compo-
nent retirees subject to the UCMJ the moment they received orders to return
to service)[84] the government would have to prosecute any who refused to

---

[84] The dissent believes this would be obviated by Article 2(a)(1)'s grant of jurisdic-
tion over "other persons lawfully called or ordered into, or for duty in or for training
in, the armed forces . . . ." This reading renders this portion of Article 2 to be surplus-
age. Congress need not rely on this subsection of Article 2 to recall the retired mem-
bers of the Regular component and members of the Fleet Reserve and Fleet Marine
Corps Reserve because it can rely on Article 2(a)(4) and 2(a)(6), respectively. Taking
Article 2 as a whole, this means the Article 2(a)(1) language is not intended for Con-
gress to have jurisdiction over a Regular component retiree who refuses orders to
return to active service. The dissent's legislative (re)drafting by judiciary goes well
beyond Chief Justice Marshall's famous maxim for the judicial department to merely
"say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) and, in context,
violates a "cardinal rule of statutory interpretation that no provision should be con-
strued to be entirely redundant." *Kungys v. United States*, 485 U.S. 759, 778 (1988)
(Scalia, J., plurality opinion).

return to service in the Article III courts and not have the option of a more expedient court-martial. This would bring us back to the problems pointed out by Justice Story in *Mott*, where every individual (even those already "in" the armed forces) could challenge whether or not Congress', or the President's, recall was valid—and this would all be done in the civilian court system during a time of war or national emergency. Congress already has a tidy recall system for its different entities. Active Component retirees are already subject to the UCMJ and Reserve Component Retirees are subject to the Code once they get recall orders. Excluding all retirees, in the name of equal protection, would require Congress to amend Article 2 if it wished to preserve its recall scheme.

In closing on this matter, we note that in 1949, prior to enacting the UCMJ, Congress held extensive hearings. In particular, Congress heard testimony strongly advocating for the removal of all retirees from court-martial jurisdiction, not just the retirees of the Reserve components.[85] Some

---

[85]Then-Colonel Melvin Maas, U.S. Marine Corps, (who later retired as a Major General in the Reserve Component and was a member of Congress for 16 years) testified to the House Armed Services Committee as President of the Marine Corps Reserve Association. He urged removal of jurisdiction over retired personnel. "Now I want to urge something on this committee that is perhaps revolutionary. This is the time to consider it, however. That is removing retired personnel from military control completely." When asked about "fleet Reserves and fleet Marine Corps Reserves," Colonel Maas replied, "Exactly the same principle. There is no reason why they should be restricted [subject to jurisdiction]. It is un-American." *See Uniform Code of Military Justice, Hearings on H.R. 2498 Before a Subcomm. of the H. Comm. On Armed Services*, 81st Cong. (1949), *reprinted in* William K. Suter, *Index and Legislative History: Uniform Code of Military* Justice 706-07 (William S. Hein & Co. 2000) (1950). Col Maas expressed the same sentiment to the Senate Armed Services Committee. *See Hearings on S. 857 and H.R. 4080* at 99-101. He was joined by Colonel John P. Oliver, Judge Advocate General Reserve, in arguing against jurisdiction over retirees. *See Hearings on S. 857 and H.R. 4080* at 147. Years later, the Army commissioned a study of the new UCMJ and made recommendations to Congress. "The Powell Report," named for Lieutenant General Herbert B. Powell, USA, Deputy Commanding General, United States Continental Army Command for Reserve Affairs, and head of "The Committee on the Uniform Code of Military Justice Good Order and Discipline in the Army" was apparently provided to Congress. *See* Captain John T. Willis, *The United States Court of Military Appeals: Its Origin, Operation and Future,* 55 MIL. L. REV. 92 n. 284 (1972). It strongly argued for removing jurisdiction over retirees. Powell Report at 7, 8, 175, 179. The Legislative History is merely remarked upon to show Congress was aware of the opinion from individual Service Members and the Services that retirees should not be subject to the UCMJ and not to

of the strongest advocates came from, or on behalf of, professional officers who themselves could expect to be subject to the UCMJ in retirement. Congress heard, and rejected, their concerns. Since then, Congress has had 34 general elections. It has passed Goldwater-Nichols transforming many important aspects of the land and naval Forces. It has also updated the UCMJ many times, including a recent partial revision of Article 2—specifically concerning Reservists, no less[86]—and has continued to reject the input it received almost 70 years ago.

Now this Court is faced with a novel interpretation of the interplay of Article 2, UCMJ, and Fifth Amendment equal protection. This court is now asked to "find" in the Constitution the same favored policy of other professional military officers which was rejected by Congress, and continually rejected since. This would be a remarkable act of judicial activism. It is possible not subjecting Regular component retirees or members of the Fleet Reserve and Fleet Marine Corps Reserve, or both, to court-martial jurisdiction is the best policy. That is for Congress to decide.

## C. Appellant Waived Any Lack of Notice: He Was Subject to Trial by Court-Martial Under the UCMJ for Misconduct Committed in a Foreign Country

For the first time on appeal, Appellant argues the Government violated his Fifth Amendment Due Process right to fair notice when it failed to inform him under Article 137, UCMJ, or otherwise, that he was still subject to the Code while in the Fleet Reserve for misconduct committed in a foreign country. We hold Appellant waived any review of this issue by not raising it with the court below.

Waiver is the "intentional relinquishment or abandonment of a known right."[87] A plea of guilty generally waives any nonjurisdictional errors that occurred in the earlier stages of the proceedings.[88]

Appellant's claim to lack of notice prior to entering his guilty pleas does not amount to a claim of lack of jurisdiction over the offenses or a challenge to the voluntary and intelligent character of his pleas. We find these voluntary

---

"interpret" Article 2's meaning. *See Conroy v. Aniskoff*, 507 U.S. 511 (1993) (Scalia, J., concurring) ("We are governed by laws, not by the intentions of the legislators.").

[86] *Supra*, n. 25.

[87] *United States v. Gladue,* 67 M.J. 311, 313 (C.A.A.F. 2009) (citations omitted).

[88] *United States v. Lee*, 73 M.J. 166, 170 (C.A.A.F. 2014) (citations omitted).

actions waived any due process violation or other issue related to his claimed lack of notice. Because Appellant waived this issue, there is no error for this Court to review on appeal.[89]

**D. Punitive Discharge**

Appellant asserts that under 10 U.S.C. § 6332, Fleet Reserve members cannot be punitively discharged from the service. This Court considered and rejected such a claim in *United States v. Dinger*, where, after examining the statute in its historical and statutory context, we

> decline[d] to override long-standing, military justice-specific provisions in the [Manual for Courts-Martial] subjecting those in a retired status to courts-martial and broadly authorizing those courts-martial to adjudge a punitive discharge. We ma[de] this decision particularly in light of the fact that Congress expressly exempted other classes of personnel from dismissal or dishonorable discharge within the UCMJ, *but not retirees*.[90]

Nor do we find the application of our holding in *Dinger*, decided prior to Appellant's trial, violates his rights against ex post facto laws.[91] It is clear from Appellant's motion made during trial that he was on notice that he could receive a punitive discharge. This Court's decision in *Dinger,* recognizing the "long-standing" practice of subjecting retirees subject to the Code to the possibility of a punitive discharge, was issued *before* Appellant's punitive discharge was adjudged.[92] Even though our superior court's opinion in the same case was issued after Appellant's trial, that opinion affirmed this Court's holding that in 10 U.S.C. § 6332 "Congress did not prohibit a court-martial from sentencing a retiree to a punitive discharge or any other available punishment established by the President."[93]

---

[89] *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017).

[90] 76 M.J. 552, 59 (N-M. Ct. Crim. App. 2017), *aff'd*, 77 M.J. 447 (C.A.A.F. 2018), *cert. denied,* __ U.S. __, 139 S. Ct. 492 (2018) (citations omitted) (emphasis in original)*Dinger*, 76 M.J. at 559 (citations omitted) (emphasis in the original).

[91] *See Bouie v. Columbia*, 378 U.S. 347, 353 (1964) (finding that judicial rulings operating to expand criminal laws may violate the Ex Post Facto Clause).

[92] Appellant's punitive discharge was adjudged on 1 December 2017. This Court's opinion in *Dinger* was issued on 28 March 2017.

[93] *United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018).

We find this AOE to be without merit.

**E. Recall to Active Duty as a Jurisdictional Prerequisite**

Finally, Appellant asserts that Fleet Reserve members must first be recalled to active duty to be subjected to trial by court-martial. But Appellant's argument does not comport with the plain language of Article 2, UCMJ. It would render Article 2(a)(6) meaningless surplusage, and has been squarely rejected by both this Court and our superior court.[94]

We find this AOE to be without merit.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined the approved findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred. Arts. 59 and 66, UCMJ. The findings and sentence as approved by the convening authority are **AFFIRMED**.

Senior Judge TANG concurs.

---

[94] *United States v. Morris*, 54 M.J. 898, 900 (N-M. Ct. Crim. App. 2001) ("If a member of the Fleet Marine Corps Reserve needed to be ordered to active duty to be subject to the jurisdiction of a court-martial, there would be no need to separately list members of the Fleet Marine Corps Reserve as being persons subject to the UCMJ.").

GASTON, Judge, with whom KING, Senior Judge, joins (concurring in part and in the result):

I agree with the principal opinion's treatment of Appellant's first, third, fourth, and fifth Assignments of Error (AOEs).

With respect to Appellant's equal protection claim, I believe he waived this claim when, after stipulating to his status as a member of the Fleet Reserve at the time of the offenses and at trial, he voluntarily pleaded guilty before a military judge, waived all waivable motions, and specifically conditioned his pleas only on preserving his asserted AOE that a member of the Fleet Reserve cannot be awarded a punitive discharge (which was litigated before the trial court and denied). Under these circumstances, Appellant's failure to raise his equal protection claim before the trial court was an "intentional relinquishment or abandonment of a known right." *United States v. Gladue,* 67 M.J. 311, 313 (C.A.A.F. 2009) (citations and internal quotation marks omitted). Since the equal protection issue was waived, there is no error for this Court to review on appeal. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017).

While questions of jurisdiction are never waived, a plea of guilty generally waives any non-jurisdictional errors in the proceedings. RULE FOR COURTS-MARTIAL (R.C.M.) 905(e), 907(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.); *United States v. Lee*, 73 M.J. 166, 170 (C.A.A.F. 2014) (citations omitted). There are some limitations to the waiver doctrine, but as our superior court has explained,

> those limits are narrow and relate to situations in which, *on its face*, the prosecution may not constitutionally be maintained. Such limits do not arise where an appellant merely complains of antecedent constitutional violations or a deprivation of constitutional rights that occurred prior to the entry of the guilty plea, rather they apply where *on the face of the record* the court had no power to enter the conviction or impose the sentence.

*Id.* at 170 (citations and internal quotations marks omitted) (emphasis added). There is no colorable claim that either on its face the prosecution could not constitutionally be maintained against Appellant or that on the face of the record the court-martial had no power to enter the conviction or impose the sentence. To the contrary, under clear case precedent from both this Court and our superior court, a prosecution at court-martial may constitutionally be maintained against a member of the Fleet Reserve, and nothing on the face of the record suggests the court-martial lacked the power to accept Appellant's pleas, enter his convictions, or impose his sentence. *See United States v. Overton*, 24 M.J. 309, 311 (C.M.A. 1987) (noting "[t]his type

of exercise of court-martial jurisdiction [over a member of the Fleet Marine Corps Reserve] has been continually recognized as constitutional") (citations omitted); *United States v. Dinger*, 76 M.J. 552 (N-M. Ct. Crim. App. 2017) (upholding a court-martial's power to both try and punitively discharge a member of the Fleet Marine Corps Reserve), *aff'd*, 77 M.J. 447 (C.A.A.F. 2018), *cert. denied,* __ U.S. __, 139 S. Ct. 492 (2018).[1]

As Appellant's equal protection claim leaves untouched this binding case precedent grounding his court-martial's jurisdiction over him as a member of the Fleet Reserve, his equal protection claim is fundamentally not about a lack of jurisdiction, but about challenging Article 2(a)(6), UCMJ, as "a deprivation of constitutional rights that occurred prior to the entry of [his] guilty plea." *Lee*, 73 M.J. at 170. Appellant's opening brief asserts that his court-martial deprived him variously of his Sixth Amendment right to trial by jury, First Amendment freedoms, and constitutional right to protection against unequal punishments. These claims simply re-frame old challenges to the military justice system that the Supreme Court has long rejected based on the text and design of the Constitution and "the differences between the military and civilian communities [that] result from the fact that 'it is the primary business of armies and navies to fight *or be ready to fight* wars should the occasion arise.'" *Parker v. Levy*, 417 U.S. 733, 743 (1974) (quoting *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17 (1955)) (emphasis added); *see also Ex parte Milligan*, 71 U.S. 2, 123 (1866) (explaining why the Sixth Amendment right to a jury trial is, commensurate with the language of the Fifth Amendment right to a grand jury, excepted from those in the land and naval forces).

Narrowed at the en banc oral argument, Appellant's claim now focuses solely on an asserted deprivation of the Sixth Amendment right to be tried by

---

[1] *See also Solorio v. United States*, 483 U.S. 435, 438 (1987) ("In an unbroken line of decisions from 1866 to 1960, this Court interpreted the Constitution as conditioning the proper exercise of court-martial jurisdiction over an offense on one factor: the military status of the accused.") (internal quotation marks and citations omitted); *United States v. Tyler*, 105 U.S. 244, 246 (1882) (finding, in regard to military retirees, "[i]t is impossible to hold that men who are by statute declared to be a part of the army, who may wear its uniform, whose names shall be borne upon its register, who may be assigned by their superior officers to specified duties by detail as other officers are, who are subject to the rules and articles of war, and may be tried, not by a jury, as other citizens are, but by a military court-martial, for any breach of those rules, and who may finally be dismissed on such trial from the service in disgrace, are still not in the military service").

randomly chosen peers who are a representative cross-section of the community.[2] It is well settled that this right does not apply to Service Members tried by court-martial, who instead have the closely-resembled right to be tried by a fair and impartial panel of their fellow Service Members. *United States v. Dowty*, 60 M.J. 163, 169 (C.A.A.F. 2004) (citations omitted); Article 25, UCMJ, 10 U.S.C. § 825. The Supreme Court recently examined the rights afforded to Service Members at court-martial—a judicial institution it noted is "older than the Constitution"—and found that

> [e]ach level of military court decides criminal "cases" as that term is generally understood, and does so in strict accordance with a body of federal law (of course including the Constitution). The procedural protections afforded to a service member are *virtually the same* as those given in a civilian criminal proceeding, whether state or federal.

*Ortiz v. United States*, 138 S. Ct. 2165, 2174-75 (2018) (citation and internal quotation marks omitted) (emphasis added). Appellant asserts that in affording him a jury right that is virtually, but not exactly, the same as what the Sixth Amendment affords to civilians—i.e., the same right Appellant elected to give up by voluntarily pleading guilty before a military judge—his court-martial violated his right to equal protection.

Attacking a statute on grounds of equal protection in this manner must be done at the trial level, or else is subject to waiver. In *United States v. Cupa-Guillen*, for example, the appellant asserted for the first time on appeal that 8 U.S.C. § 1326 violated constitutional equal protection because it sought to punish him based on his status as an "alien"—a suspect classification—after he was deported for a felony conviction and thereafter found again in the United States. 34 F.3d 860, 862-63 (9th Cir. 1994), *cert. denied*, 513 U.S. 1120 (1995). The Court of Appeals for the Ninth Circuit held this facial attack on the statute's constitutionality, on grounds of equal protection, was waived because it was not raised with the trial court. *Id.* at 864. The Court of Appeals for the Sixth Circuit reached the same conclusion regarding a facial equal protection challenge to a state criminal statute, declining to consider such a challenge raised for the first time on appeal based on the "well established principle of appellate review that appellate courts do not address

---

[2] *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975) (accepting "the fair cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment").

claims not properly presented below." *Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir. 1987).

The Supreme Court has addressed this issue in the context of a defendant who pleads guilty to a charge and then later claims a violation of the constitutional protection against double jeopardy. The general rule in such cases is that "[w]here the state is precluded by the United States Constitution from haling a defendant into court on a charge, federal law requires that a conviction on that charge be set aside even if the conviction was entered pursuant to a counseled plea of guilty." *Menna v. New York*, 423 U.S. 61, 62 (1975). However, the Court established an important exception to this general rule:

> We do not hold that a double jeopardy claim may never be waived. We simply hold that a plea of guilty to a charge does not waive a claim that—*judged on its face*—the charge is one which the State may not constitutionally prosecute.

*Id.* at 62 n.2 (emphasis added). Thus, if on the face of the indictment and the existing record, the charge does not appear to violate the constitutional protection against double jeopardy, the appellant's failure to develop the issue at the trial level waives it on appeal. *United States v. Broce*, 488 U.S. 563, 576 (1989).

Similarly, Appellant's assertion here is that constitutional equal protection precludes him from being tried by court-martial for violations of the UCMJ. This challenge cannot be determined on the face of the attacked statute.[3] And Appellant's failure to lodge this claim with the court below leaves us thin means in the record to address such a weighty constitutional claim of first impression.[4] We have some authority to consider additional extrinsic evidence at this level. *See, e.g., United States v. Oliver*, 57 M.J. 170, 172 (C.A.A.F. 2002) (considering unchallenged medical documentation submitted to appellate court to address jurisdictional challenge brought for first time on appeal). But piecemeal, ad-hoc supplementation of the record at the appellate

---

[3] Equal protection requires that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). But the determination of whether the persons at issue are "similarly circumstanced" cannot be made without comparative evidence of what their circumstances are, which is not contained in the language of Article 2.

[4] This predicament is compounded where, as here, Appellant seeks heightened constitutional scrutiny for his claim, which if applicable would impose an additional evidentiary burden on the Government to develop regarding the attacked statute.

level was never designed to take the place of litigating these issues before the trial court. To the contrary, the waiver rule exists precisely to avoid this sort of novel constitutional issue from being asserted for the first time on appeal.[5] *See United States v. King*, 58 M.J. 110, 114 (C.A.A.F. 2003) (explaining that the "raise-or-waive" rule is designed "to promote the efficiency of the entire justice system by requiring the parties to advance their claims at trial, where the underlying facts can best be determined").[6]

Finally, while our superior court has held "there is a presumption against the waiver of constitutional rights," that presumption is overcome where it is "clearly established that there was an intentional relinquishment of a known right or privilege." *United States v. Sweeney*, 70 M.J. 296, 303-04 (C.A.A.F. 2011) (quoting *United States v. Harcrow*, 66 M.J 154, 157 (C.A.A.F. 2008)). To make this determination, "we look to the state of the law at the time of trial, and we will not find waiver where subsequent case law 'opened the door for a colorable assertion of the [constitutional] right . . . where it was not previously available.'" *Sweeney*, 70 M.J. at 304 (quoting *Harcrow*, 66 M.J. at 157-58).

Looking to the state of the law at the time of Appellant's trial, we find no subsequent development in the law that opened the door for his equal protection claim in a way that was not previously available. To whatever extent his claim is colorable now, it was colorable to no less a degree at the time of his trial. Thus, in light of his voluntary decision to plead guilty before a military judge, waive all waivable motions, and specifically condition his pleas only on preserving a different issue, Appellant's failure to raise his equal protection claim at trial was a clear, intentional relinquishment of a known right.[7] This

---

[5] In this very case, we initially ordered the Government to produce various "adjudicative facts" based on involuntary recall data for the Navy and Marine Corps.

[6] Respectfully, the dissent's position both that strict scrutiny applies and that this issue can nevertheless be resolved "on almost exclusively legal grounds, requiring little factual development," does not acknowledge the protracted litigation of such issues that routinely occurs at the trial level, where initial decisions often turn on the presence or absence of evidence in support of the claim asserted. *See, e.g., Nat'l Coal. For Men v. Selective Serv. Sys.*, 355 F. Supp. 3d 568, 579 (S.D. Tex. 2019) (pointing to lack of certain "demonstrable facts" and other evidence as justification for the court's legal conclusions on an equal protection claim). Imposing an evidentiary requirement (heightened or otherwise) at a forum level unsuitable for developing evidence on the issues involved seems merely a recipe to strike down a statute.

[7] The dissent argues that applying waiver in this case "would diverge from the Court's recent practice regarding retiree challenges," citing our decisions in *United States v. Dinger*, 76 M.J. 552, 555 (N-M. Ct. Crim. App. 2017), *aff'd*, 77 M.J. 447 (C.A.A.F. 2018), *cert. denied,* __ U.S. __, 139 S. Ct. 492 (2018), and *United States v.*

claim is fundamentally not about whether his court-martial had jurisdiction over him—which it most assuredly did, based on both the existing record and binding case precedent from our superior court—rather, it is about whether exercise of that jurisdiction deprived him of a discrete procedural right—which equally-binding precedent has long established the Constitution does not afford to someone of Appellant's military status. The issue is therefore waived.

Senior Judge KING concurs.

---

*Larrabee*, No. 201700075, 2017 CCA LEXIS 723 (N-M. Ct. Crim. App. 29 Nov. 2017) (unpub op.), *aff'd*, 78 M.J. 107 (C.A.A.F. 2018), *cert. denied,* __ U.S. __, 139 S. Ct. 1164 (2019), wherein, despite an unconditional plea of guilty, we addressed the issue, raised for the first time on appeal, of whether a court-martial may punitively discharge a member of the Fleet Marine Corps Reserve. But neither of those cases actually addressed the issue of waiver, and *Larrabee* did little more than cite *Dinger* in summarily denying the assertion of error. Practice is not precedent, and even if it were, the application of waiver is and must always be a case-by-case determination. *See United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (discussing that review by the military courts of criminal appeals under Article 66, UCMJ, must include an evaluation of the entire record in each case, including such factors as a "waive all waivable motions" provision or unconditional plea of guilty, in determining whether to approve a finding or sentence). Thus, *Dinger* and *Larrabee* offer little support for the view that this Court must entertain a facial equal protection challenge to a decades-old statute that was never brought in the court below.

CRISFIELD, Chief Judge, with whom HITESMAN, Senior Judge, and LAW-RENCE, Judge, join (dissenting):

I respectfully dissent from the principal opinion's holding that the Uniform Code of Military Justice's (UCMJ) jurisdictional scheme for retirees satisfies an equal protection analysis and disagree with the concurring opinion that Appellant waived his equal protection claim. I believe that the disparate treatment of retirees from the active and Reserve components offends the Due Process Clause of the Fifth Amendment and that Appellant's claim is a jurisdictional issue which cannot be waived.

## I. MEMBERS OF THE FLEET RESERVE ARE SIMILARLY SITUATED WITH RETIRED MEMBERS OF THE REGULAR AND RESERVE COMPONENTS

The principal opinion holds that retired members of the Fleet Reserve are not similarly situated for purposes of maintaining good order and discipline in the armed forces with retired members of the Regular and Reserve components. I acknowledge that there is little case law to guide our determination of whether these groups of retirees are similarly situated for equal protection purposes. I nonetheless feel confident determining that members of the Fleet Reserve, Regular component retirees, and Reserve component retirees are similarly situated because there is no meaningful distinction, legally or factually, between the groups that is relevant to good order and discipline in the armed forces.

Enlisted Sailors of the Navy who have completed at least 20 years of active service will be transferred to the Fleet Reserve at their request. 10 U.S.C. § 8330. Both active and Reserve component enlisted Sailors who meet the criteria can transfer to the Fleet Reserve. Officers are not eligible. Members of the Fleet Reserve have no military duties other than to "[m]aintain readiness for active service in event of war or national emergency" and to keep Navy authorities apprised of their location and "any change in health that might prevent service in time of war." Naval Military Personnel Manual, Art. 1830-040 (Ch-38, 19 Dec 2011). Fleet Reservists are entitled to "retainer pay." DoD Financial Management Regulation, DoD 7000.14-R, para. 020404, Nov. 2013. Once a member of the Fleet Reserve has reached 30 years of total service, they are entitled to transfer to the retired list of the Regular Navy if they were a member of the Regular Navy at the time of their transfer to the Fleet Reserve, or to transfer to the appropriate retired Reserve if they were a member of the Reserve Component at the time of their transfer to the Fleet Reserve. 10 U.S.C. § 6331.

With some exceptions—many of which concern disability retirements—members of the Fleet Reserve, Regular component retirees, and Reserve component retirees have all spent at least 20 years in the armed forces. All three groups include some members who have served in *both* the Regular and the Reserve components. The members of all three groups are in an inactive status and no longer perform any uniformed military duties.[1] They are all subject to recall to active duty. They are all ineligible for further promotion. They are all entitled to retired pay at some point in their retired years. Retirees from an active component begin receiving retired pay immediately upon retirement. Retirees in the Fleet Reserve—whether they were in the active or Reserve components—begin receiving "retainer pay" immediately upon retirement. Retirees from a Reserve component who do not transfer to the Fleet Reserve generally begin receiving retired pay at age 60. For all of these retirees, once they are entitled to retired pay, the pay continues for the duration of their lives and increases according to a cost of living formula. Their retired pay is *not* contingent on their continued military usefulness or employability. Their actual ability to contribute to the accomplishment of a military mission is completely irrelevant to their status.

Military courts have noted the legal similarity between Fleet Reservists and retired personnel. In *United States v. Allen*, 33 M.J. 209 (C.M.A. 1991), our superior court stated that the Fleet Reserve is "legally, an almost identical status" to retirees. *Id.* at 216 (citing *United States v. Overton*, 24 M.J. 309 (C.M.A. 1987), *cert. denied*, 484 U.S. 976 (1987)).

In this Court's *Dinger* opinion, we treated members of the Fleet Marine Corps Reserve[2] as similarly situated to retired members. "We will refer generally to Fleet Marine Reserve and retired list membership as 'retired status,' as military courts have treated the two statuses interchangeably for purposes of court-martial jurisdiction." *United States v. Dinger*, 76 M.J. 552, 554 n. 3 (N-M. Ct. Crim. App. 2017), *aff'd*, 77 M.J. 447 (C.A.A.F. 2018), *cert. denied*, __ U.S. __, 139 S. Ct. 492 (2018).

---

[1] Although members of the Fleet Reserve notionally have an obligation to "[m]aintain readiness for active service in event of war or national emergency" and may be required to perform active duty every four years, the Government has not represented that they bear any actual duties such as periodic training, musters, medical exams, or physical fitness tests; that they are ever called to active duty; or that there is any consequence for failure to maintain readiness.

[2] The Marine Corps analogue to the Fleet Reserve.

The Supreme Court has not rendered an opinion on whether these groups of retirees are similarly situated, but in *Barker v. Kansas*, 503 U.S. 594 (1992), the Court made no effort to differentiate them.[3] Retiree pay has traditionally been considered reduced pay for reduced services—*i.e.*, a retainer pay. *See, e.g.*, *United States v. Tyler*, 105 U.S. 244 (1882). But in *Barker*, the Supreme Court characterized retiree pay as "deferred compensation" for services rendered during active duty for purposes of 4 U.S.C. § 111, a law permitting states to tax Federal employees' pay. *Barker*, 503 U.S. at 605. The Court overturned the Kansas Supreme Court's ruling that military retiree pensions can be taxed differently than state government retiree pensions due to the military pension's nature as "retainer pay," and other nuances of military retiree status. *Id.* Although the *Barker* Court characterized retiree pay as "deferred compensation," it emphasized that "[m]ilitary retirees unquestionably remain in the service and are subject to restrictions and recall." *Id.* at 599, 602. The Court made no effort to differentiate between Regular and Reserve retirees within the class and implicitly held them to be similarly situated with regard to the characterization of their retired pay.

As we consider whether the three groups at issue are similarly situated, we should look to each group's *current* degree of connectedness to the armed forces—not to *past* connections. *See United States ex rel. Toth v. Quarles*, 350 U.S. 11, 22 (1955) (suggesting that retaining jurisdiction over former soldiers, with no relation to active components, would not improve discipline amongst the active ranks). The official Department of Defense (DoD) policy on the utilization of retirees reinforces our opinion that these three groups are in fact similarly situated.

The DoD instruction on "Management of Regular and Reserve Retired Military Members" establishes policy and provides procedures for the activation and employment of retired members. Dep't of Def. Instr. 1352.01: *Management of Regular and Reserve Retired Military Members* (2016) [hereinafter DoDI 1352.01]. I first note that the instruction states that the Navy's Regular component retired members includes members of the Fleet Reserve. *Id.*, at ¶ 3.1(a)(2). This is consistent with my view that members of the Navy's Fleet Reserve are, in all relevant respects, retired for purposes of this Court's equal

---

[3] *Barker* was a taxpayers' class-action lawsuit in which the class was defined as: "[A]ll retired members of the federal or United States armed forces who are recipients of federal armed forces retirement benefits [under applicable provisions of Title 10 or Title 14 or the United States Code] subject to Kansas state income taxation . . . ." *Barker v. State*, 815 P.2d 46, 48 (Kan. 1991) (first and second alterations in original), *rev'd, Barker v. Kansas*, 503 U.S. 594 (1992).

protection analysis. It also reflects the reality in the Fleet, where members of the Fleet Reserve refer to themselves as "retired" and have "retirement ceremonies" upon transfer to the Fleet Reserve. Finally, and most convincingly, the Fleet Reserve should be considered similarly situated with Regular component retirees when one considers that the Army, Air Force, and Coast Guard have no analogous category to the Fleet Reserve, yet retirement eligibility rules are uniform across the Services.

I also find it relevant and noteworthy that in describing DoD's four-part policy on the utilization of retired members, the instruction makes no distinction between retired members of the Regular and Reserve components.[4] Similarly, in describing the criteria for retiree mobilization, the instruction does not mention active or Reserve component status as a criterion for mobilization.[5] This formal DoD policy comports with my experience regarding how

---

[4] To wit:

> It is DoD policy that:
>
> a. *Regular retired members and members of the retired Reserve* may be ordered to active duty (AD) as needed to perform such duties as the Secretary concerned considers necessary in the interests of national defense as described in Sections 688 and 12301 of Title 10, U.S.C.
>
> b. *Regular retired members and members of the retired Reserve* must be managed to ensure they are accessible for national security and readiness requirements.
>
> c. *Regular and Reserve retired members* may be used as a manpower source of last resort after other sources are determined not to be available or a source for unique skills not otherwise obtainable.
>
> d. Directors of agencies that have Defense related missions . . . may identify military and federal civilian positions that are suitable for fill by *retired military members* in time of war or national emergency. . . .

DoDI 1352.01 (8 Dec. 2016) at ¶ 1.2(a)-(d) (emphasis added). Note that 10 U.S.C. § 12301 (referenced in para. 1.2(a)) places a statutory limitation on the involuntary activation of retired reservists to times when Congress has declared a time of war or national emergency and the secretary of the military department has made a finding that there are not enough qualified active reserves who are readily available.

[5] DoDI 1352.01 at ¶ 3.2(c) ("As part of the criteria for deployment of individuals to specific mobilization billets, the Military Services will consider the criticality of the mobilization billet, the skills of the individual, and his or her geographic proximity to the place of mobilization.").

the various Services seek to integrate their Reserve components as seamlessly as possible with their active components.[6]

The principal opinion agrees with Appellee's argument that retired members of the Reserve components are dissimilar from Regular retirees because they are not required to maintain any military status. They cite Department of Defense Financial Management Regulation 7000.14-R, Vol. 7B, Ch. 6, para. 0604, for this proposition. This chapter concerns "Foreign Citizenship After Retirement" and I find the Financial Management Regulation's interpretation unconvincing. Instead, I would find that the status and obligations of retired reservists are very similar to Regular retirees.

The Navy's Military Personnel Manual describes the obligations and benefits of retired reservists:

> Retired reservists must keep NAVPERSCOM (PERS-912) advised of their current mailing address and of any temporary or permanent changes of residence . . . . Reservists receiving pay must also update address changes with Defense Finance and Accounting Services . . . .
>
> . . . Retired Navy reservists who plan to travel or reside in any country not within the jurisdiction of an area commander should, upon arrival in and departure from each country (except for brief tours), notify their presence to the nearest U.S. naval attaché, as a matter of courtesy, by personal visit or by letter. In the absence of a naval attaché, notify the U.S. military or air attaché, or the civilian representative of the American embassy or consulate.
>
> . . . [C]ivil employment and compensation with any foreign government, or any concern controlled in whole, or in part, by a group of governments (including the United States) is subject to the approval of SECNAV and the Secretary of State. . . .
>
> . . . [R]etired personnel not on active duty will be entitled to wear the prescribed uniform of the rank or rating, in which re-

---

[6] *See, e.g.,* Chief of Naval Operations General Administrative Message, NAVADMIN 121/05, dtd 3 June 2005, Subject: *Active-Reserve Force Integration* ("We will now refer to all of our sailors, active and reserve, as United States Navy Sailors. This shared title will strengthen the bond between our active and reserve components, and enhance the culture of integration needed to most effectively deliver decisive power from the sea.").

tired, when the wearing of the uniform is considered to be appropriate. . . .

. . . Retired personnel may use their military titles subject to certain restrictions and the exercise of good judgment. Considerable discretion should be shown by members in permitting the use of their name and military title to endorse any commercial enterprise which might, in any way, be perceived as indicating that the Department of the Navy approves of the enterprise and especially to avoid an endorsement or contract which would bring discredit upon the Navy. All reserve members transferred to the Retired Reserve are eligible to use "United States Navy–Retired" in their title.

. . . .

. . . Retired members of the Navy Reserve and former members receiving retired pay from the Navy are eligible for TRICARE Prime, Standard, or Extra (from ages 60 through 64) and TRICARE for Life (TFL) (with Medicare Parts A and B coverage) at age 65.

. . . Family members, survivors of retired members, and "former members" are eligible for TRICARE Prime, Standard, or Extra. . . .

. . . .

. . . Retired members and their family members, including those age 65 and over, are eligible for the Uniform Services Family Health Plan (USFHP), a TRICARE Prime option.

Naval Military Personnel Manual, Art. 1820-030, para. 7 (Ch-53, 1 Dec 2015). Retired reservists are also entitled to the use of the military exchange system, morale welfare and recreation facilities, military commissaries, and space available transportation on military aircraft. *Id.* Retired reservists may also be *voluntarily* recalled to active duty in a retired status as authorized by the Secretary of the Navy. DoDI 1352.01.

The fact that Article 2(a)(5), UCMJ, subjects retired reservists receiving hospitalization from an armed force to court-martial jurisdiction also hints at some military status for this group. (If Congress' concern was merely to maintain good order and discipline in military hospitals, then it would subject *all* persons receiving military hospitalization to the Code.) Finally, and most importantly, the fact that retired reservists are subject to immediate recall into active service under certain circumstances runs counter to the argument that they have no military status whatsoever.

Retired members of both the active and Reserve components are similarly—though not identically—subject to involuntary recall to active duty. While unusual, retired members of both the active and Reserve components may be involuntarily recalled to active duty by a service secretary. The secretary of a military department has authority to involuntarily order a retired member of a Reserve component to active duty for the duration of a war or national emergency and for six months thereafter, provided that Congress has declared a time of war or national emergency and the secretary determines there are not enough qualified reserves in an active status. DoDI 1352.01 at ¶ 3.3(b)(1); *see also* 10 U.S.C. § 12301. In contrast, the secretary of a military department has authority to involuntarily order a retired Regular member to active duty "at any time to perform duties deemed necessary in the interests of national defense in accordance with Sections 688, 689, 690, and 12307 of Title 10, U.S.C." DoDI 1352.01 at ¶ 3.3(b)(2).

Appellee argues that two groups must be "virtually identical" for us to determine that they are similarly situated for equal protection purposes. The principal opinion adopts a "materially identical" standard. I think those standards are too simplistic. Instead, I believe that the particular governmental interest in issue is highly relevant to whether groups are similarly situated and has to be factored into the analysis. Two groups of people may be similarly situated for the purpose of one governmental interest but not for a different interest. The Supreme Court's case law regarding the military's treatment of servicemen and servicewomen leads to this conclusion. In *Schlesinger v. Ballard*, 419 U.S. 498 (1975), the Court held that male and female Navy officers were not similarly situated for purposes of a statute that treated them differently regarding mandatory discharge after failure to be selected for promotion. The Court contrasted the governmental purpose they were examining with the purpose the Court had analyzed in *Frontiero v. Richardson*, 411 U.S. 677 (1973), that held that servicemen and servicewomen were similarly situated when being treated differently under the law. The particular governmental interest in issue must be considered when analyzing whether groups are similarly situated.

Given that this is an issue of first impression, I have found no precedent in case law standing for—or against—the proposition that retired members of the active and Reserve components are similarly situated for equal protection purposes, but my view is not entirely novel. During testimony on the proposed Article 2, UCMJ, before the House Armed Services Committee, Robert W. Smart, a professional staff member on the House of Representatives' Committee on Armed Services, noted with concern that the jurisdictional scheme would mean "treating two classes of people on the same retired list differently." *Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcomm. Of the H. Comm. on Armed Services,* 81st Cong. (1949) [hereinaf-

ter *UCMJ Hearing*], *reprinted in* William K. Suter, *Index and Legislative History: Uniform Code of Military Justice* 1261 (William S. Hein & Co. 2000) (1950). As I discuss below, Congress ultimately tolerated the disparate treatment in order to accommodate differences in how the Services managed retirees—differences that are no longer applicable. But I would find that this bit of legislative history corroborates my sense that retirees of the Reserve and active components are in fact similarly situated.

Based on these considerations, I am convinced that members of the Fleet Reserve, retired members of the Regular components, and retired members of the Reserve components are similarly situated for purposes of equal protection analysis.

## II. THE DISPARATE TREATMENT OF REGULAR AND RESERVE RETIREES VIOLATES THE GUARANTEE OF EQUAL PROTECTION UNDER THE LAW

Military and civilian courts have long held that Congress can lawfully subject military retirees to court-martial jurisdiction. This Court has so held on multiple occasions. I believe, however, that this is the first case in any court in which a military retiree has challenged that jurisdiction by claiming that the UCMJ's differing treatment of different categories of retirees violates the equal protection guarantee.

Congress undoubtedly has broad power under Article I, Section 8, clause 14 of the Constitution "[t]o make Rules for the Government and Regulation of the land and naval Forces." Nonetheless, that expansive power is constrained by the Fifth Amendment's guarantee of Due Process and the imputed guarantee of Equal Protection.

The disparate treatment provided to retirees from the active and Reserve components is plain on the face of Article 2. Appellant claims that the distinction violates his right to equal protection because Article 2 deprives him of his constitutional rights to free speech, grand jury indictment, and a jury of his peers, while preserving those rights for similarly situated retirees from Reserve components.[7]

Court-martial jurisdiction has always been considered a special type of criminal jurisdiction significantly different from civil courts and responsive to

---

[7] During the second oral argument Appellant stated that he had narrowed his claim and now only complains that he was deprived of the right to a jury trial.

the special needs of the armed forces that do not exist in civil society. "Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections." *Reid v. Covert*, 354 U.S. 1, 21 (1957). Military jurisdiction was always intended "to be only a narrow exception to the normal and preferred method of trial in courts of law." *Id.* Therefore, notwithstanding Congress' broad constitutional power, the Supreme Court has held that due to the perceived inadequacies of courts-martial compared to Article III courts, Congress must limit its exercise of court-martial jurisdiction to "*the least possible power adequate to the end proposed.*" *Quarles*, 350 U.S. at 23 (emphasis in original) (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 230-31 (1821)).[8]

Appellant urges us to apply strict scrutiny to Congress' Article 2 jurisdictional scheme because he claims that the unequal treatment he received under Article 2 deprived him of fundamental rights. Strict scrutiny analysis requires the challenged statute to serve a "compelling governmental interest," and the means taken to be "narrowly tailored" to accomplish this goal. *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

Counter-balancing the proposition that strict scrutiny is the appropriate level of review when fundamental rights are in the balance, we have a judicial duty to provide Congress with great deference when it legislates pursuant to its Article I, Section 8 powers. "[J]udicial deference . . . is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Goldman v. Weinberger,* 475 U.S. 503, 508 (1986) (quoting *Rostker v. Goldberg,* 453 U.S. 57, 70 (1981)); *see also Solorio v. United States*, 483 U.S. 435 (1987).

I do not see any contradiction in performing a strict scrutiny analysis while providing Congress with great deference. Judicial deference "does not mean abdication." *Rostker*, 453 U.S. at 70. For instance, in *Nat'l Coal. for Men v. Selective Serv. Sys.,* 355 F. Supp. 3d 568 (S.D. Tex. 2019), the district court recognized that "the court's deference to Congress's 'studied choice' is potentially at its height" but still used intermediate-level scrutiny to analyze

---

[8] "There are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution. Free countries of the world have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service." *Quarles*, 350 U.S. at 22.

a gender-based equal protection challenge to Congress' decision to require males, but not females, to register for the Selective Service. *Id.*, at 580.

Equal protection case law supports the proposition that strict scrutiny is the appropriate level of judicial review of governmental action that impinges on a fundamental right. *Phyler v. Doe*, 457 U.S. 202, 217 n. 15 (1982) ("In determining whether a class-based denial of a particular right is deserving of strict scrutiny under the Equal Protection Clause, we look to the Constitution to see if the right infringed has its source, explicitly or implicitly, therein."); *see also United States v. Marcum*, 60 M.J. 198, 204-05 (C.A.A.F. 2004) (analyzing the nature and scope of the right identified by the Supreme Court in *Lawrence v. Texas*, 539 U.S. 558 (2003) and *Lawrence's* applicability to Article 125, UCMJ). When a law impinges upon the "exercise of a fundamental right," courts may treat the law as "presumptively invidious." *Plyler*, 457 U.S. at 216-17; *see also Quarles*, 350 U.S. 11 (1955) (invalidating a law that would subject a separated Service Member to court-martial jurisdiction, in spite of traditional deference to Congress on military matters).

Court-martial jurisdiction deprives a defendant of the right to a presentment of the charges to a grand jury under the Fifth Amendment.[9] It also denies a defendant his Article III[10] and Sixth Amendment[11] right to trial by a jury of his peers. "A service member has no right to have a court-martial be a jury of his peers, a representative cross-section of the community, or randomly chosen." *United States v. Dowty,* 60 M.J. 163, 169 (C.A.A.F. 2004) (citing *Ex parte Quirin*, 317 U.S. 1, 39-41 (1942)).

In the context of determining the proper scope of court-martial jurisdiction, the Supreme Court has stated: "[I]n view of our heritage and the history of the adoption of the Constitution and the Bill of Rights, it seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right." *Reid v. Covert*, 354 U.S. 1, 9 (1957). "Trial by jury in a court of law and in accordance with traditional modes of procedure after an indictment by grand jury has served

---

[9] "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces . . . ." U.S. CONST. amend. V.

[10] "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ." U.S. CONST. art. III, § 2, cl. 3.

[11] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. CONST. amend. VI.

and remains one of our most vital barriers to governmental arbitrariness. These elemental procedural safeguards were embedded in our Constitution to secure their inviolateness and sanctity against the passing demands of expediency or convenience." *Id.* at 10.

In my view, these rights are undoubtedly "fundamental rights" for equal protection purposes and Appellant was denied their protection by virtue of being subject to the UCMJ. *Covert*, 354 U.S. at 21.

To avoid application of the strict scrutiny standard, Appellee contends that court-martial jurisdiction does not burden any fundamental right. Citing *United States v. Dowty*, 60 M.J. 163, 169 (C.A.A.F. 2004), the Government argues that the rights to grand and petit juries are not fundamental rights because "Appellant, subject to court-martial jurisdiction, has no Sixth Amendment right to a jury chosen from a fair cross-section of the community. His argument for strict scrutiny review fails."[12] This argument, however, starts with the presumption that the Appellant has been lawfully subjected to court-martial jurisdiction—the very notion he challenges here. That Article 2, UCMJ, subjects the Appellant to court-martial jurisdiction does not alter the fundamental character of these rights for purposes of our analysis. Under the UCMJ as it then existed, neither Robert Toth nor Clarice Covert had a right to trial by jury. Yet in *Toth v. Quarles* and *Reid v. Covert* the Supreme Court's analysis began with the understanding that the rights to grand and petit juries are fundamental.[13]

If, as I believe, fundamental rights are at stake, this Court should determine whether Article 2's different treatment of similarly situated retiree groups is narrowly tailored to advance a compelling government interest.

In my view the purpose of military justice is to maintain good order and discipline in the armed forces.[14] When Congress legislates in the field of military justice, as it has done in Article 2, UCMJ, its objective is to promote good order and discipline in the armed forces, which is undoubtedly a compelling governmental interest.

---

[12] Government Brief at 10.

[13] *See Toth*, 350 U.S. at 16 ("This right of trial by jury ranks very high in our catalogue of constitutional safeguards."); *Covert*, 354 U.S. at 9 ("[I]t seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right.").

[14] *See* MCM, Preamble, ¶ 3.

The principal opinion opines that the Government's compelling interest in this case is being prepared to respond to catastrophic military necessity that could threaten our Nation's existence. I respectfully disagree and believe that this formulation is too broad to explain Congress' purpose in enacting the UCMJ. I also believe that if that were, in fact, the compelling government interest, then the relevant subsections of Article 2 would fail even a rational basis test. There is no rational basis for Congress to severely restrict UCMJ jurisdiction over Reserve component retirees if its purpose in doing so is to ensure that the broadest set of military and former military personnel remain ready to respond to existential threats to the nation. In that case the only rational action would be for Congress to maximize UCMJ jurisdiction.

Again, there is no doubt that Congress can lawfully subject military retirees to court-martial jurisdiction. *United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018); *see also United States v. Hooper*, 26 C.M.R. 417, 425 (C.M.A. 1958). The question for this Court should be whether the jurisdictional scheme that Congress has created in Article 2 is narrowly tailored to its compelling interest in maintaining good order and discipline in the armed forces. In my view it is not.

The legislative history of the creation of the UCMJ provides insight as to why Congress structured Article 2 the way it did.[15] I believe that in creating the UCMJ in 1949, Congress was attempting to tailor the law's jurisdiction to two military services with different administrative structures.[16]

Prior to the adoption of the UCMJ, the Articles for the Government of the Navy and the Articles of War governed the separate justice systems of the Navy and Army, respectively. Each system was tailored to the specific needs of its service. In the Navy, retired members of the Regular and Reserve components were on the same retired list. All retirees were managed and paid by the Navy and amenable to jurisdiction under the Articles for the Government of the Navy. In the Army, on the other hand, Regular retirees were administered by the Army and Reserve retirees were administered by the Veteran's Administration. The Army did not consider its retired reservists as subject to the Articles of War. This discrepancy needed to be resolved by Congress in order to put the "U" in the UCMJ.

---

[15] The current versions of the Article 2 subsections in issue here are nearly unchanged from their 1950 origins.

[16] While the Department of the Air Force was formed under the National Security Act of 1947, it derived from, and was structured most similarly to, the Army.

The solution was for the Navy to relinquish court-martial jurisdiction over retired reservists in order to be consistent with the Army:

> Mr. Smart.[17] It appears to me—I just cannot tell for certain—that this [draft Article 2] is a relaxation of jurisdiction over Navy retired officers on the retired list. Is that correct?

> Admiral Russel.[18] That is correct.

> Mr. Larkin.[19] That is correct.

> Mr. Smart. You see the point there, Mr. Chairman, is that the physically retired Navy Reserve officer is on the same retired list as the regular officer of the Navy. The physically retired Army officer is certified to VA as being authorized to draw retirement pay—not retired pay but retirement pay.

> So there has been a great difference in the past as between physically retired Navy Reserves and Army retired Reserve officers. I just wanted to make certain here that the Navy was relinquishing courts-martial jurisdiction over retired reserve officers. And they say that that is correct.

*UCMJ Hearing, supra*, at 868.

The inequity of subjecting active, but not Reserve, retirees to court-martial jurisdiction was not lost on the House of Representatives committee staff:

> Mr. Smart. I am reluctant to say, Mr. Chairman, what my recommendation [regarding jurisdiction over retirees] would be.

> I would point this one thing out to you: It seems a little inconsistent to me that retired personnel of a Regular component are subject when as a matter of fact you have non-Regular personnel in the Navy who are on the same retired list and entitled to the same rights and benefits as the regular.

---

[17] Robert W. Smart was a Professional Staff Member on the House of Representatives' Committee on Armed Services.

[18] Rear Admiral George L. Russel, U.S. Navy, was testifying about the formation of a legal corps within the Navy.

[19] Felix Larkin was Assistant General Counsel in the Office of the Secretary of Defense.

The Navy apparently here has waived their right to their jurisdiction, so that the retired non-Regular Navy officer, even though he is on the retired list of the Navy will not be any more subject to the code than the non-Regular Army officer who is drawing retirement pay from the Veteran's Administration.

It is treating reserves alike, I will admit, but it is treating two classes of people on the same retired list differently too.

*Id.* at 1261.

The Committee Report from the House of Representatives succinctly laid out the rationale for the difference in treatment:

Paragraph (5) [draft Article 2(a)(5), UCMJ] represents a lessening of jurisdiction over retired personnel of a Reserve component. Under existing law, the Navy retains jurisdiction over retired Reserve personnel since such personnel are on the same retired list as members of a regular component. The Army has no such jurisdiction since retirement benefits for non-regular officers are administered by the Veteran's Administration. This paragraph relinquishes jurisdiction over its Reserve personnel except when they are receiving hospitalization from an armed force. This standardizes jurisdiction of the armed forces over Reserve personnel.

H.R. Rep. No. 81-491, at 10 (1949), *reprinted in* Suter, *supra.* An identical explanation appeared in the corresponding Senate report. S. Rep. No. 81-486, at 7 (1949), *reprinted in* Suter, *supra.* I am aware of the potential pitfalls of relying on legislative history to ascribe purposes to Congressional action. Nonetheless, it is noteworthy that the legislative history of Article 2 from 1949 contains no competing rationale, explanation, theory, or conjecture concerning *why* Congress chose to subject Regular retirees to UCMJ jurisdiction but not Reserve retirees.

If Article 2, UCMJ, was originally tailored by Congress, however awkwardly, to the administrative needs of the Army and Navy, it appears that those needs no longer exist. Instead, it appears that each Service now manages and administers its own Reserve retirees. *See, e.g.,* 10 U.S.C. § 12731(b) ("Application for [non-Regular] retired pay under this section must be made to the Secretary of the military department, or the Secretary of Homeland Security, as the case may be, having jurisdiction at the time of application over the armed force in which the applicant is serving or last served").; *see also,* 10 U.S.C. § 12731(f)(3) ("The Secretary concerned shall periodically notify each member of the Ready Reserve . . . of the current eligibility age for retired pay of such member under this section, including any reduced eligibil-

ity age by reason of the operation of that paragraph. Notice shall be provided by such means as the Secretary considers appropriate taking into account the cost of provision of notice and the convenience of members."). Each Service now administers its retirees, both active and Reserve.

Furthermore, I would find that the structure of Article 2 jurisdiction over current retirees is not narrowly tailored to the compelling government interest in maintaining good order and discipline in the armed forces. UCMJ jurisdiction is simply not related to a retiree's connectedness to the armed forces or ability to effectively contribute to military missions. Active service in the military requires a relatively high level of physical fitness, which is why every military service employs a periodic physical fitness test with negative consequences for Service Members who perform poorly.[20] An elderly and infirm active component retiree is less likely to be able to contribute to the accomplishment of military missions than a middle-aged Reserve component retiree in good health. Yet, the active component retiree of questionable military utility may be court-martialed for violations of the UCMJ, and suffer the deprivation of fundamental rights that such jurisdiction entails, while a younger and more physically fit Reserve component retiree is immune from UCMJ jurisdiction.

Article 2(a)(4) states that a retired member of a Regular component "entitled to pay" is subject to the UCMJ. Such language indicates that Congress may have viewed entitlement to pay as a useful criterion for determining UCMJ jurisdiction. In my view, entitlement to pay fails entirely as a narrowing criterion, however, because many Reserve component retirees are also entitled to pay and yet remain outside UCMJ jurisdiction.[21] The retired pay structure for Reserve retirees is also completely disconnected from a Reserve retiree's actual ability to contribute to military missions. Indeed, for Reserve component retirees the relationship between entitlement to pay and military utility is essentially inverted. When a Reserve retiree is younger, they are more likely to be able to withstand the physical rigors of active military service and less likely to be receiving retired pay. When older, they are more

---

[20] It is also why active duty personnel are required to submit to periodic health assessments, immunizations, vaccines, vision exams, occupational hearing screenings, and maintain medical and dental readiness, while those in the Fleet Reserve and other retirees have no such requirements.

[21] Retirees from a reserve component are generally entitled to retired pay, but they do not start receiving it until age 60. Some retired reservists can earn retired pay as early as age 50 if they qualify under rules that reduce the age at which they start receiving pay. *See* 10 U.S.C. § 12731(f).

likely to be receiving retired pay and less likely to be militarily useful. For both Regular and Reserve retirees, once they are entitled to retired pay, the entitlement continues for the duration of their lives and increases according to a set formula. Neither's retired pay is contingent on their continued military usefulness. In my view, entitlement to pay does not help tailor Article 2's jurisdictional scheme to Congress' compelling interest in maintaining good order and discipline in the armed forces.

My review indicates that Article 2 is not narrowly tailored to the achievement of a compelling government interest. Instead, it appears that Article 2's retiree jurisdiction structure is an anachronistic vestige of Congress' effort to create a *uniform* code of military justice for military services that traditionally had different administrative needs. Article 2's retiree jurisdiction rules reflect an administrative compromise that has outlived its necessity and is not tailored to current governmental interests.

It is clear to me that Congress could lawfully subject *all* retirees of the armed forces to UCMJ jurisdiction. Conversely, it could subject *no* retirees of the armed forces to jurisdiction.[22] It could also narrowly tailor retiree jurisdiction in such a way to satisfy the compelling interest in maintaining good order and discipline in the armed forces. Article 2 as structured, however, is not narrowly tailored to that interest. Accordingly, I would find that the UCMJ's jurisdictional structure for retirees violates the right of equal protection imputed to the Fifth Amendment.

---

[22] The majority claims that subjecting no retirees to the Code would lead to the absurd result that the Government would not be able to court-martial retirees who did not comply with orders to return to duty. I do not view this as a realistic problem since Article 2(a)(1), UCMJ, subjects to UCMJ jurisdiction all "persons lawfully called or ordered into, or to duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it." It is also precisely the current situation with regard to Reserve personnel. The majority also opines that subjecting all retirees to UCMJ jurisdiction would lead to an absurd result: retired reservists, who were not subject to the Code during their years of active participation in the reserves except when they were performing duties, would be subject to the Code as retirees even when not performing duties. This example is accurate, but could be easily solved by tying UCMJ jurisdiction to entitlement to retired pay. This would also solve the equal protection problem.

### III. APPELLANT'S ISSUE CONSTITUTES A
### JURISDICTIONAL CLAIM WHICH CANNOT BE WAIVED

I also respectfully disagree with the concurring opinion's position that Appellant waived appellate consideration of his equal protection claim by failing to raise it at his court-martial, by unconditionally pleading guilty, and by agreeing to waive all "waivable" motions in his pretrial agreement.

Ordinarily, motions not raised at trial and not preserved through a not guilty plea or a conditional guilty plea are waived. Rules for Courts-Martial (R.C.M.) 905(e), Manual for Courts-Martial (MCM), United States (2016 ed.). Jurisdictional defects are an exception to this general rule and are never waived. R.C.M. 905(b)(1). The concurring opinion would hold that the subject of Appellant's claim is equal protection, not jurisdiction. As I view the issue, however, it is plainly jurisdictional. It directly concerns the constitutionality of Article 2, UCMJ, the Article that establishes which persons are subject to personal jurisdiction under the UCMJ.

If Appellant is correct, then there is a jurisdictional defect in his court-martial. Since jurisdictional challenges are never waived—even by an unconditional guilty plea—the issue is appropriate for review. *United States v. Bradley*, 68 M.J. 279, 281 (C.A.A.F. 2010) (holding that an unconditional guilty plea waives only nonjurisdictional defects).

My concurring colleagues would also hold that Appellant's pretrial agreement with the convening authority waives this issue on appeal. Since the Rules for Courts-Martial prohibit any pretrial agreement term that purports to waive the accused's right to challenge the jurisdiction of the court-martial, and I believe that this is a jurisdictional claim, I believe that Appellant's issue is not waived. R.C.M. 705(c)(1)(B).

The concurring opinion cites this Court's opinion in *Dinger* for the proposition that this claim is waived. I note that the appellant in *Dinger* also unconditionally pleaded guilty at his court-martial before raising his claim alleging that as a retiree he was not subject to a punitive discharge. Arguably, the appellant in *Dinger* was in a worse position regarding waiver than the instant Appellant, since Gunnery Sergeant Dinger signed a pretrial agreement in which he acknowledged that a punitive discharge "[m]ay be approved as adjudged."[23] Nevertheless, this Court did not hold that he waived his claim. Similarly, in *United States v. Larrabee*, No. 201700075,

---

[23] AE VII, *United States v. Dinger,* No. 201600108, Record of General Court-Martial Proceedings.

2017 CCA LEXIS 723 (N-M. Ct. Crim. App. 29 Nov. 2017) (unpub op.), *aff'd*, 78 M.J. 107 (C.A.A.F. 2018), *cert. denied*, ___ U.S. ___, 139 S. Ct. 1164 (2019), this Court did not find waiver when a member of the Fleet Marine Corps Reserve, who was convicted pursuant to his pleas, challenged his amenability to a punitive discharge. In that case, the appellant even signed a pretrial agreement explicitly stating that he understood that a dishonorable discharge was mandatory for the offense to which he was pleading guilty. Still, we did not apply waiver. Applying waiver in the instant case would diverge from this Court's practice regarding retiree challenges.

The concurring opinion also states that by not invoking waiver, this Court is forced to adjudicate a complex issue that was not factually developed at the court-martial. That is true, but it is true of any unwaivable issue that is raised for the first time on appeal. Indeed, the instant issue is more amenable to original appellate adjudication than many jurisdictional issues since it may be resolved on almost exclusively legal grounds, requiring little factual development.

Senior Judge HITESMAN and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court